UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-61577-CIV-ALTONAGA/Simonton

OCEAN'S 11 BAR & GRILL, INC.,

      Plaintiff,

vs.

INDEMNITY INSURANCE
CORPORATION RRG, *et al.*,

      Defendants.

_____/

<u>ORDER SETTING FORTH COURT'S FINDINDS OF
FACT AND CONCLUSIONS OF LAW</u>

     **THIS CASE** came before the Court for a non-jury trial between July 20 through 24, 2012.  The Court has carefully considered the testimony of the witnesses, the exhibits admitted in evidence, the parties' written submissions, and the applicable law.  Based on a review of the record and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## I.  INTRODUCTION

### A.     The Pleadings

     This case involves an insurance coverage dispute — Plaintiff, Ocean's 11 Bar & Grill, Inc. ("Ocean's 11") alleges Defendant, Indemnity Insurance Corporation RRG ("Indemnity"), improperly rescinded insurance policies *ab initio* and therefore must provide coverage under the policies' terms.  (*See* Second Am. Compl. ("SAC") [ECF No. 95]).  Ocean's 11 named additional Defendants as necessary and indispensable parties to Count I of the Second Amended Complaint, as they are potential third-party beneficiaries to the general liability insurance policies at issue.   These parties chose not to participate in the trial (*see* motions [ECF Nos. 153,

155, 157]), and the Court does not refer to them again for purposes of these findings.

Ocean's 11 obtained several policies of insurance from Indemnity providing liability coverage for its bar and restaurant in Broward County, Florida. (*See* SAC ¶ 1). Ocean's 11 obtained policy 600115 for the period February 11, 2009 through February 12, 2010 (*see id.* 2 n.1 (noting policy "60015" was obtained), Exs. A & B to SAC (noting policy "600015" was renewed)); renewed the insurance for the year 2010 under policy 6000890 (*see* SAC ¶ 4; Ex. A to SAC); and again renewed the insurance for the year 2011 under policy 6001760 for the period ending February 11, 2012 (*see* SAC ¶¶ 4, 22). Ocean's 11 used the services of an insurance agent to obtain the insurance. (*See id.* ¶ 4). A lawsuit was filed against Ocean's 11 seeking damages for assault and battery to one of the bar's patrons, and Ocean's 11 has received notice of other claims for injuries sustained at the premises. (*See id.* ¶¶ 6, 7). By letter dated May 25, 2011, Indemnity informed Ocean's 11 that it was rescinding the three insurance contracts "for reasons not specifically articulated" (*id.* ¶ 8). Indemnity has failed to provide Ocean's 11 a defense to the pending suit or coverage for the potential losses. (*See id.* ¶ 9).

Ocean's 11 brought this suit presenting one claim for declaratory relief (Count I), requesting a finding that it has liability coverage under the policies and Indemnity improperly rescinded the insurance contracts. In Count II, Ocean's 11 presents a claim of breach of contract, stating it paid the insurance premiums for the three policies, performed all conditions, and nonetheless Indemnity refused to provide a defense or coverage for the claimed losses. Ocean's 11 seeks its attorney's fees for having had to bring this action in Count I pursuant to Florida Statute sections 627.733 and 627.428 (*see id.* ¶ 21e), and as damages for the breach of contract count stated in Count II, attorney's fees incurred in defending the underlying state suits.

In its Answer and Affirmative Defenses [ECF No. 99], Indemnity admitted it "rescinded

and voided ab initio Plaintiff's Policies pursuant to the Warrant Provision on the Nightclub Applications and § 627.409, Florida Statutes based on Plaintiff's material misrepresentations, omissions, concealed material facts or material incorrect statements in the underwriting and negotiation of the Policies" (*id.* ¶ 8).  Indemnity raised ten affirmative defenses: Ocean's 11 "made material misrepresentations, omissions, concealed facts or [sic] material incorrect statements in the underwriting and negotiation" of the policies (*id.* ¶¶ 30, 31); Ocean's 11 fails to state a claim for relief (*see id.* ¶ 32); the language of the policies is clear and unambiguous (*see id.* ¶ 33); Plaintiff failed to satisfy conditions precedent (*see id.* ¶ 34); if the Court determines coverage exists, Indemnity's obligations are subject to the terms of the policies (*see id.* ¶ 35); Indemnity tendered the return of premiums and Plaintiff's damages should be reduced (*see id.* ¶ 36); "Plaintiff's causes of action are barred by the equitable doctrine of unclean hands" (*id.* ¶ 37); and any relief sought by Plaintiff should be limited to declaratory relief (*see id.* ¶ 38).

### B.   Pre-Trial Representations

#### 1.   *Indemnity's Proposed Findings*

On June 4, 2012, Indemnity submitted its Proposed Findings of Fact and Conclusions of Law ("Defendant's Proposed Findings") [ECF No. 136], giving the Court and Plaintiff a roadmap of how Indemnity perceived the issues and the facts that would be established at trial. Defendant's Proposed Findings explain that Joseph Franco ("Franco"), Indemnity's owner, has worked in the restaurant and bar business since 1988.  (*See id.* ¶¶ 3, 4).  According to a Multi Line Inspection prepared by Majestic Service Company ("Majestic") in 2007, Ocean's 11 had the capacity of accommodating 75 persons.  (*See id.* ¶ 6).  Ocean's 11's gross receipts reported for 2008 were $822,777.00.  (*See id.* ¶ 7).  The Majestic inspection found Ocean's 11 had a total area of 3,456 square feet and a public access area of 3,000 square feet.  (*See id.* ¶ 10).  Until

April 2011, Ocean's 11 had no formal alcohol awareness training.  (*See id.* ¶ 11).

Ocean's 11 began shopping for insurance coverage in November 2008, and used the services of David Reiter ("Reiter") of Sierra Financial ("Sierra") as its insurance agent, relying on his expertise in procuring insurance coverage and completing insurance applications.  (*See id.* ¶¶ 6, 16, 19, 20).  Ocean's 11 submitted an application for insurance to Indemnity in November 2008, including the Majestic inspection report.   (*See id.* ¶ 17).  According to Indemnity, several items answered in the 2008 application for insurance were incorrect, including the existence of an alcohol awareness program, the number of security personnel, that background checks are performed on security personnel, a projected total annual revenue of $500,000, the maximum occupancy, total square footage of 3,000, and use of persons under age 12 or 18 in promotions. (*See id.* ¶¶ 26, 27, 28).  Indemnity did not issue Ocean's 11 any insurance coverage in November 2008.  (*See id.* ¶ 29).

On February 11, 2009, Indemnity submitted an updated application, with information identical to the 2008 application with two exceptions: the policy period was different, and while Franco's signature appears on the application, his name in truth is signed by Reiter, whose handwriting appears throughout the application.  (*See id.* ¶ 38).  According to Indemnity, the Court should find "Mr. Franco, through Mr. Reiter and on behalf of Plaintiff, agreed to the terms of [the] warranty [contained in the application regarding the accuracy of the information] when he issued his signature thereon."  (*Id.* ¶ 41).   Indemnity issued the first insurance policy (the "2009 policy") to Ocean's 11 based on the representations made in the 2009 Nightclub Application.  (*See id.* ¶ 42).  During a loss control visit to Ocean's 11 in May 2009, Indemnity learned that Ocean's 11's security consisted of a doorman. (*See id.* ¶¶ 44, 45).  At the end of the 2009 policy period, Indemnity performed an audit of Plaintiff's gross receipts, and in June 2010

Plaintiff provided an audit response showing actual gross receipts of $750,000 and a profit and loss statement showing $834,629.67 in gross receipts.  (*See id.* ¶¶ 46-48).  As a consequence, Indemnity charged an additional premium for the insurance coverage provided under the 2009 policy. (*See id.* ¶ 49).

 In January 2010, Ocean's 11 submitted a new application for insurance coverage, with information identical to the information supplied in the 2008 and 2009 applications.  (*See id.* ¶¶ 50, 51).  Again, Franco did not sign this application.  (*See id.* ¶ 52).  "The 2010 Nightclub Application also contained identical warranty language to the 2009 Nightclub Application . . . to which Plaintiff agreed when Franco, through Mr. Reiter, signed on its behalf."  (*Id.* ¶ 53).  A 2010 Confirmation of Application Answers Form ("Confirmation") confirmed the information in the 2009 and 2010 applications (*see id.* ¶¶ 54, 55), stated Franco had six years of experience owning or managing Ocean's 11 or a similar establishment (*see id.* ¶ 56), and "contained identical warranty language to the 2009 and 2010 Nightclub Applications, to which Plaintiff agreed when Mr. Franco's signature was issued thereon" (*id.* ¶ 57).  Indemnity issued an insurance policy (the "2010 policy") for the February 11, 2010 to February 11, 2011 period, based on the representations in the application and Confirmation.  (*See id.* ¶ 58).

During a loss control visit in March 2010, Indemnity learned that no patrons under age 21 were permitted except for lunch service.  (*See id.* ¶ 60).  Indemnity also completed an audit on Ocean's 11's gross receipts for the 2010 period, was given documentation from Ocean's 11 that the amount was $1,094,554.26, and charged Ocean's 11 additional premium.  (*See id.* ¶¶ 61–64).

On December 30, 2010, Ocean's 11 submitted a new application with information identical to that provided in the earlier years except that the gross annual receipts were now $1,000,000.  (*See id.* ¶¶ 72, 73).  Again Franco did not sign it; rather, Reiter completed and

signed it on Franco's behalf.  (*See id.* ¶ 74).   In February 2011, Ocean's 11 submitted a Confirmation showing Franco only had five years of experience and Ocean's 11 measured 4,000 square feet.  (*See id.* ¶¶ 76, 77).   Based on the representations contained in the application and Confirmation, Indemnity issued an insurance policy to Ocean's 11 (the "2011 policy"), for the period February 11, 2010 to February 11, 2011.  (*See id.* ¶ 79).[1]

In its proposed conclusions of law submitted prior to trial, Indemnity suggested the Court find the following false statements by Ocean's 11 entitled Indemnity to rescind the three policies of insurance: (1) statements concerning a formal alcohol awareness training program; (2) the maximum number of security personnel employed on a given night; (3) whether background checks were performed on persons employed as security personnel; and (4) stating on the 2011 application that it did not employ off-duty police officers when it began doing so in March 2010. (*See id.* 15).   Indemnity also separately identified inconsistencies regarding basic facts, such as Ocean's 11's occupancy, square footage, and gross receipts.   (*See id.* 21).   Furthermore, Indemnity proposed the Court find "although the signatures on the Nightclub Applications are not Mr. Franco's — but rather Mr. Reiter signing Mr. Franco's name — and although Mr. Franco attested that he did not read each of the Nightclub Applications prior to them being submitted to Indemnity, Plaintiff is nonetheless bound by the warranty language."  (*Id.* 19).

## 2.    *The Parties' Joint Pre-Trial Stipulation*

On July 18, 2012, the parties submitted their Joint Pre-Trial Stipulation ("Stipulation") [ECF No. 165].  In the Stipulation, Indemnity identified the following as the misrepresentations that entitle it to rescind insurance coverage *ab initio*: (1) the square footage of the establishment; (2) the anticipated gross receipts in the 2009 and 2011 applications for insurance; (3) the

---

[1]  The Court acknowledges that the coverage period for the 2011 policy, as noted by Indemnity, is identical to the coverage period for the 2010 policy.  (*Compare* Def.'s Proposed Findings ¶ 58, *with id.* ¶ 79).

response concerning a formal alcohol awareness training program; (4) the maximum number of security employees on duty; (5) the background checks performed on security personnel; and (6) the utilization of off-duty policy officers.   (*See id.* 2–3).   Indemnity also identified inconsistencies about basic facts such as Ocean's 11's occupancy, under-21 policy, and the experience of Franco in the bar/restaurant industry.   (*See id.* 3).   The parties presented the following issues of law for determination by the Court: whether Indemnity correctly rescinded insurance coverage based upon the material misrepresentations identified by Indemnity, or whether the application questions were ambiguous and so the answers should be construed in favor of the insured and coverage found to exist.   (*See id.* 8).

## II.  FINDINGS OF FACT

Ocean's 11 has sued its insurer, Indemnity, seeking in Count I a declaration that Indemnity improperly rescinded three insurance contracts to avoid defending and paying claims asserted against Ocean's 11, and in Count II damages for breach of the contracts of insurance. Ocean's 11 proved it had three policies of insurance issued by Indemnity; Ocean's 11 performed its obligations by paying premiums, submitting to audits by Indemnity, and paying any excess amounts determined pursuant to those audits; and it notified Indemnity of claims, seeking the benefits of the liability insurance purchased by it, whereupon Indemnity advised it that the policies were rescinded *ab initio*; and Ocean's 11 has incurred damage by having to provide its own defense to claims, all the while being uncertain of whether Indemnity properly rescinded the contracts of insurance.  The Court's findings below, therefore, focus on Indemnity's affirmative defenses seeking to avoid a judgment against it on both Counts.

### A.    Indemnity's Defense of Material Misrepresentations

The Indemnity insurance applications, all prepared by Jeff Cohen ("Cohen"), Indemnity's

owner,[2] contain a warranty section entitled "Warrant."  This "Warrant" states in pertinent part:

> The undersigned represents and warrants, to the best of his/her knowledge and belief, based on reasonable inquiry, that the particulars and statements set forth on this application are true, correct and entirely complete, and there are no other risk factors that have not been disclosed herein.  If any particulars or statements are materially misrepresented or material information has been omitted intentionally or accidentally, such misrepresentation or omission will void any issued coverages and the insurance company will have no duty to defend any claims, pay any damages, or pay sums or perform acts or services.  The undersigned agrees and acknowledges that the particulars and statements set forth herein are material to the acceptance of the risk assumed by the insurance company and that the insurance company is relying upon the truth and completeness of the risk factors disclosed herein.  It is agreed by the undersigned that this application, including any material submitted herewith, shall be the basis of the contract should a policy be issued, and this application shall be attached to and become a part of the policy.

(Tr. Exs. 7, 11, 15)[3] (capitalization omitted).  The insurance proposals prepared by Indemnity, which confirm the applicant's answers, either repeat the "Warrant" (*see, e.g.*, Tr. Ex. 16) or include a "Warranty" statement, which reads, in relevant part, as follows:

> The undersigned represents and warrants, to the best of his/her knowledge and belief, based on reasonable inquiry, that the particulars and statements set forth in this binding request form, all application forms and materials provided therewith by the undersigned are true, correct and entirely complete, and there are no other risk factors that have not been disclosed to the insurance company.  If any particulars or statements are materially misrepresented or material information has been omitted intentionally or accidentally, such misrepresentation or omission will void any issued coverages and the insurance company will have no duty to defend any claims, pay any damages, or pay sums or perform acts or services.  The undersigned agrees and acknowledges that the particulars and statements set forth herein

---

[2] While Defendant previously stipulated in a Unilateral Pretrial Stipulation [ECF No. 135] that Cohen is its owner (*see id.* ¶ 4), at trial Cohen testified he is not the owner of Indemnity nor does he own shares in the company.

[3] No page numbers appear on any of the pages of the applications.

are material to the acceptance of the risk assumed by the insurance company and that the insurance company is relying upon the truth and completeness of the risk factors disclosed herein.  It is agreed by the undersigned that this binding request form, all application forms and materials provided therewith shall be the basis of the contract should a policy be issued, and that the application form and materials provided therewith shall become part of the policy. If the information in this binding request form or the application form materially changes prior to the effective date of the policy, the undersigned will notify the insurance company immediately in writing and the insurance company may modify or withdraw any outstanding quotation or proposal.

(Tr. Ex. 7) (capitalization omitted).

At trial, Franco testified concerning how the insurance applications were filled out. Franco began operating bars and restaurants in 1991, and in 2008 he used the services of insurance agent David Reiter to try to obtain liability coverage for Ocean's 11.  He acknowledged that Reiter went over the questions on the application forms with him over the telephone, and Franco authorized Reiter to fill out the applications and sign Franco's name to them.

On May 9, 2011, in response to an inquiry by Indemnity seeking information regarding an April 30, 2011 incident at Ocean's 11, Juan Marquez ("Marquez"), an Ocean's 11 shift manager, advised Indemnity that there were four security staff persons on duty at the time of the incident, none of the bartenders had alcohol awareness training, and no background checks were performed on security personnel.  Asserting that the information supplied by Marquez showed Ocean's 11's answers to the questions in the insurance applications were incorrect, Indemnity sent Ocean's 11 a letter on May 25, 2011 voiding all three policies of insurance *ab initio*. Ocean's 11's president, Franco, never authorized Marquez to respond to the email inquiry or to supply the information contained in the response.  Furthermore, Marquez, as a shift manager, did not have access to the information or knowledge Franco possessed to properly answer

Indemnity's questions.  At trial, Franco testified concerning the correct information that should have been supplied to Indemnity had he been on site on the day the email inquiry arrived, and acknowledged that he did not timely correct any misinformation that Marquez had supplied Indemnity.

The material misrepresentations Indemnity identified as bases for its rescission of the insurance policies, beginning with its letter of May 25 and amplified following discovery in its Answers to Interrogatories, in its Proposed Findings, and in the parties' Pre-trial Stipulation, concern the following items:

1.   Ocean's 11 misrepresented the square footage of the business to be 3,000 square feet;
2.   Ocean's 11 misrepresented the anticipated annual gross receipts to be $500,000;
3.   Ocean's 11 misrepresented that it did not allow persons other than those trained in their formal alcohol awareness training program to serve alcohol to patrons;
4.   Ocean's 11 misrepresented that it employed a maximum of two (2) security employees on any given night;
5.   Ocean's 11 misrepresented that it conducted background checks on all security employees;
6.   Ocean's 11 misrepresented the amount of experience of its owner/manager at different times, representing the amount to be five (5) years or ten (10) years of experience;
7.   Ocean's 11 misrepresented its maximum occupancy; and
8.   Ocean's 11 employed off-duty police officers and did not advise Indemnity.

Indemnity, asserting each of these so-called material misrepresentations as affirmative defenses, carried the burden of persuasion as to each at trial.  The Court now expresses its factual findings on each of these contentions.

### 1.   Ocean's 11's Square Footage

In each of the applications for insurance, in response to a question asking "Square Footage," Ocean's 11 answered "3,000."  Franco interpreted the question regarding the

establishment's square footage to be requesting public access square footage and believed his response was accurate. Nevertheless, as stated, Indemnity received in November 2008 the Majestic inspection results, showing Ocean's 11's total square footage was 3,456, and 3,000 was the number corresponding to public access. Prior to binding coverage for Ocean's 11, therefore, Indemnity had in its files the total square footage of the entire establishment.

Morstan General Agency of Florida II ("Morstan") is a wholesale insurance broker, and it had a contract, or producer agreement, to place insurance through Indemnity. At trial, Gregg Kligler, co-manager and senior underwriter of Morstan, testified via deposition that if an insurance company intends to use square footage as a factor in arriving at a premium amount, it is typically the total amount of public access square footage that is considered. Nevertheless, Indemnity's underwriting guidelines do not even list square footage as a factor in determining the appropriate insurance rate.

Indemnity conducted an on-site inspection on May 8, 2009, showing the estimated square footage to be 4,000, but did nothing to reconcile the discrepancy with Ocean's 11 in the two subsequent years it renewed the policies of insurance with Ocean's 11. And yet, internally the proposal for insurance prepared by Indemnity in January 2011 reflected the assumption that Ocean's 11's total square footage was 4,000. And curiously, the insurance rate for the 2011–2012 policy period went down from rate charged (inclusive of additional premiums collected) during the 2009–2010 policy period, despite the fact that for that policy period Indemnity was using 4,000 square feet rather than the 3,000 square feet disclosed by Franco.

Indemnity had the Majestic inspection results since November 2008 showing Ocean's 11's actual square footage, thereafter confirmed that number during the 2009 policy period with its own on-site inspection, and continued to renew insurance for the two subsequent policy

periods.

### 2.       *Anticipated Gross Receipts*

The applications for insurance contained the question "Gross Receipts," requesting the applicant to project its gross receipts and provide an estimate.  In response to the question in the applications for the first two policies of insurance posed as "Gross Receipts," Ocean's 11 responded "$500,000."  As a bar owner, Franco had no way of knowing what his actual sales would be; his estimates were based on a slowing economy and the knowledge that if his projections were too low, Indemnity's audit of sales at the end of each policy period would result in Ocean's 11 paying additional premium.  In response to the same question in the application for the final, 2011 policy, Ocean's 11 answered "$1,000,000.00."

Cohen of Indemnity testified that a mere dollar in gross receipts greater than projected amounts disclosed in an application for insurance amounts to a misrepresentation, notwithstanding that the question calls for a projection or an estimate.  Following the February 2009 audit of Ocean's 11's gross receipts, Indemnity charged and collected an additional premium of $11,969 for the first year of coverage based on actual gross revenues of $834,629.67.  For the 2010 policy, Indemnity collected an additional premium of $16,042.  Based on these figures, there does not appear to be any direct correlation between premiums paid and actual gross revenue.  For example, although there was a reduction in the total amount in premiums paid from $32,117 for the 2010 policy (based on actual gross revenue of $1,094,554.26), to the quoted premium for the 2011 policy of $26,030 (based on projected gross revenue of $1,000,000), curiously, the insurance rate went down for the 2011–2012 policy period ($26,030) in comparison to the 2009–2010 policy period ($28,044), despite Ocean's 11's enlargement of projected gross revenue by over $165,000.

With regard to the misrepresentation query, it bears noting that Ocean's 11 did not file its income tax return for 2008 until July 29, 2010, well after the February 2009 application for the 2009 policy, and even after the application for the 2010 policy, which was dated January 19, 2010.  Ocean's 11 filed its income tax return for 2009 on September 22, 2010, showing gross receipts of $936,916.  The policy period does not precisely match the taxable year period.

When Franco submitted the applications for the 2009 and 2010 policies, he did not have ready access to the information shown in his income tax returns, as he explained he did not have a computerized system for tracking financial data.  By the time Ocean's 11 submitted the application for the 2011 policy, it had sufficient information with which to change this answer to $1 million.  Even knowing Ocean's 11 had under-estimated its projected gross receipts for the 2009 and 2010 policies because of the audits it performed and upon receipt of the changed answer in the final application for insurance, Indemnity issued Ocean's 11 the 2011 policy.  By its own actions, Indemnity showed these answers not to have operated as material misrepresentations.

### 3.     *Formal Alcohol Awareness Training Program*

The applications for insurance ask the following question: "Does the applicant allow persons other than employees trained in their Formal Alcohol Awareness training program to serve alcohol to patrons? (i.e. Guest Bartenders, etc)."  In response, Ocean's 11 answered "No." Franco testified he had never heard of the acronym TIPS, which Cohen testified, like the acronym TAM, signified a formal alcohol awareness program recognized by the hospitality, bar and restaurant industry.  Cohen did not use either of these acronyms in the applications for insurance he prepared for Indemnity, but rather capitalized the words "Formal Alcohol Awareness" in the applications, presumably to alert applicants to the type of program he

envisioned.

According to Franco, he interpreted the question to be asking whether Ocean's 11 had guest bartenders, and Ocean's 11 does not.  Franco explained Ocean's 11 has a system where a senior bartender is paired with a new hire for training, and this is his alcohol awareness program; he did not allow anyone who was not trained in-house (by being assigned to an experienced bartender for training) to serve alcohol to patrons.  Franco was not familiar with the term "formal alcohol awareness program," and construed it to be the equivalent of Ocean's 11's in-house training system.  However, in a 2008 application for insurance submitted to Sierra Underwriters, Franco wrote in response to the question "Are Employees Given Liquor Training," "Yes," explaining as to type and when trained: "TIPS, quarterly."  At trial, Franco explained he did not know what TIPS was at the time he signed the Sierra 2008 application filled out by his agent.

Cohen testified that he capitalized the words "Formal Alcohol Awareness" because it is a term used in the industry.  According to Cohen, TIPS and TAM qualify as formal alcohol awareness programs.  Furthermore, by adding the words "guest bartenders" in parentheses at the end of the question, he intended to trigger the memory of the applicant concerning whether the applicant had ever used guest bartenders, but he did not intend to limit the question, as such, to guest bartenders.  According to Cohen, an inaccurate answer to this question would not only affect the rate charged for coverage, it would also impact the decision whether to issue coverage in the first place.

The question concerning a formal alcohol awareness program is inartfully and carelessly worded.  First, in asking "Does the applicant allow persons other than employees trained in their Formal Alcohol Awareness training program to serve alcohol to patrons? (i.e. Guest Bartenders, etc)," it is unclear what the possessive pronoun "their" refers to; it appears Cohen would have it

modify the singular "applicant" but the only plural noun appearing before its use is "employees." Second, the parenthetical "(i.e. Guest Bartenders, etc)" offers no clarity about what is intended by the question. Notwithstanding Cohen's familiarity with such acronyms as TIPS and TAM, those are nowhere used in his application, nor have they ever been defined for the Court. The undersigned finds Franco's testimony concerning his interpretation of the question to be credible, and the "TIPS, quarterly" answer in the 2008 Sierra application is not remarkable, as that form, like the ones submitted by Franco to Indemnity, was filled out by an agent rather than Franco.

### 4.    *Number of Security Personnel*

Question number 30 on the applications asks, "What is the maximum number of security on any given night?" Ocean's 11 answered "2." The question then asks, "Average per night?" and Ocean's 11 answered "1." Marquez's email to Indemnity stated Ocean's 11 had four security personnel on duty on April 20, 2011. Franco explained this answer by Marquez was incorrect. When Ocean's 11 submitted its answers to the Indemnity applications, Franco believed the question to be asking him about security personnel and not including door people within that category of employees. According to Franco, Ocean's 11 never employed more than two security personnel on any night, and only used security personnel on Friday and Saturday nights, when a maximum of two were used. At least one door person works every night, checking IDs, making sure patrons do not arrive belligerent or drunk, and checking for compliance with the dress code. Door people are not considered "security" by Franco. Consequently, when he answered the question, he answered truthfully as to his security personnel, or bouncers, and because they only worked two nights a week, he averaged them out in his response to the question "Average per night?".

According to Cohen, employees who "work the door" are security personnel. However,

the Indemnity applications provide no definition of what is meant by "security," and Franco's interpretation was not an unreasonable one. Furthermore, Indemnity's underwriting guidelines reflect no higher rate for establishments utilizing security employees of between 1 and 5. Consequently, while Cohen considers security a key component of Indemnity's assessment of an applicant's risk, in failing to offer an expansive definition and in light of its own underwriting guidelines which do not treat any differently establishments with one or five security personnel, Indemnity cannot complain that Ocean's 11's answer, which addresses security personnel only and not door people, constitutes a material misrepresentation.

### 5.     *Background Checks*

Question 29(b) of the Indemnity insurance applications asks, "Are background checks completed on all security employees?", to which Ocean's 11 responded "Yes." Franco testified this answer was correct, as he uses the services of criminal defense attorney Allison Gillman in checking for any prior offenses in prospective employees. The reports he is given by the lawyer are verbal, not in writing. The only evidence to rebut this testimony was Marquez's contrary answer in the email to Indemnity. Indemnity provided no evidence concerning the basis for Marquez's knowledge, or whether in responding to the email Marquez was performing tasks assigned to him and of which he was capable in answering. Notably, Marquez did not testify at trial.

### 6.     *Franco's Prior Experience*

The Indemnity Proposal for Insurance submitted by Ocean's 11's agent in February 2010 (Tr. Ex. 12, at 6), for renewal of liability insurance, asks, "Number of years of management experience the General Manager/Owner has at this location *or* another location that is a similar establishment." (emphasis added). Franco answered, "5". Franco's response to the same

question in the Proposal for Insurance submitted by Reiter in February 2011 (Tr. Ex. 16, at 6), was also "5".  At the time of trial in July 2012, Franco had five or six years of experience at Ocean's 11, but over twenty years of experience managing other bars and restaurants.  According to Kligler, "[y]ears experience" typically affects an insured's premium.  The Court infers from this that the more experience a general manager possesses, the less an insured's premium.

### 7.    Ocean's 11's Maximum Occupancy

The Indemnity applications request an applicant's maximum occupancy.  According to Cohen, this information "feeds into the same algorithm of what is the exposure of the account and what is the appropriate coverages and what is the appropriate pricing"; it "coincides with the square footage and several other factors to depict whether this is a good risk or a bad risk."

Ocean's 11 responded with the number 350.  Franco explained the maximum capacity for seated patrons is 75, but because Ocean's 11 is a bar with additional standing room, calculating 8 square feet per person, it has a total capacity from between 300 to 350 patrons.  Indemnity offered no testimony or evidence refuting Franco's calculations.

### 8.    Use of Off-Duty Police Officers

The Indemnity insurance applications ask, "Does the applicant engage police officers for work in or about the premises?"  In each of the applications it submitted, Ocean's 11 answered "No."  The first time Ocean's 11 submitted an application with Indemnity in November 2008, it had not previously hired off-duty police to provide security at its premises.  When Franco filled out the second application in January 2010, during the first year of insurance coverage, 2009, Ocean's 11 did not employ off-duty police officers. Between March and September, 2010, during the second policy period and following acts of vandalism at the premises, Ocean's 11 for the first time hired off-duty police officers for additional security in the parking lot.  Ocean's 11

did not anticipate needing to hire off-duty police officers again, and so when it submitted the third application dated December 2010, it answered "No" to the question regarding use of police officers. After Indemnity's rescission of the insurance policies, between May and August, 2011, Ocean's 11 hired off-duty police officers following an incident at the establishment.

According to Cohen, the use of off-duty police officers by an applicant is an important risk factor he needs to know. He testified that Indemnity deters the use of off-duty details by its insureds, as such use adversely impacts the potential risk of liability to the insured. While Cohen maintains Ocean's 11 had a duty to notify Indemnity if it decided in the middle of a policy period to engage police officers, he does not point to any contract language that contains this requirement. Furthermore, while Indemnity has identified this as another area where Ocean's 11 provided false information in its applications, certainly there is no evidence to suggest the answers given in the first two applications were false given that it was not until March 2010 that Ocean's 11 would commence to temporarily employ such officers. With regard to the third and final application for insurance, given the temporary use of an off-duty detail in 2010, and the absence of any events triggering knowledge by Ocean's 11 that another engagement of off-duty officers was imminent, the Court does not find Ocean's 11's answer in the final application to have been false.

### B.      Indemnity's Eleventh-Hour Defense

The preceding narrative addressing the positions Indemnity has taken throughout this litigation, as stated in its Answer and Affirmative Defenses, its pre-trial Proposed Findings of Fact and Conclusions of Law, and the Joint Pre-Trial Stipulation, was necessary in order to place in its proper context the subject the Court now addresses. At a deposition taken on April 30, 2012, Indemnity was informed that Franco did not sign his name to the insurance applications;

rather, Franco's name was signed by Franco's insurance agent, Reiter, with Franco's authorization, following telephone conversations between the two men concerning the information supplied in the applications.  Notwithstanding the knowledge concerning the manner in which the applications were filled out and signed, Indemnity prepared and filed the referenced documents in this litigation, noting that fact, and asking that the Court find Ocean's 11 to be bound by the representations contained in the applications filled out by Reiter as if Franco had completed the applications himself.  It was only at trial, during the testimony of Cohen, that Indemnity first took the position that it never would have issued the policies had it known insurance agent Reiter signed the applications using Franco's name and on behalf of Franco.

At trial the issue of Franco's signature was presented as an additional material misrepresentation of Ocean's 11.  One problem with this contention, however, is that in its Answers to Interrogatories, Indemnity nowhere identified this issue as one of the material misrepresentations it was advancing as a basis for the decision to rescind the policies of insurance, nor did Indemnity thereafter supplement its answer once it had the information revealed at the April 30 deposition, as it was required to do under the Federal Rules of Civil Procedure if indeed this fully answered the interrogatory.  In apparent recognition of this problem, Indemnity, in its post-trial Revised Proposed Findings of Fact and Conclusions of Law [ECF No. 174-1], for the first time labels this factual issue as one coming within its equitable defense of "unclean hands," appearing at paragraph 37 of its Affirmative Defenses without elaboration.  (*See id.* 23–30).

With regard to this newly-clarified defense, Cohen testified that he requires the signature of the "owner, officer, or partner" of the insured, rather than the signature of the insured's agent, "who is not in a position to make representations on behalf of the applicant."  According to

Cohen, the insured must complete and execute the applications for insurance "[b]ecause it makes it a part of the underwriting process or submission process" by which the insurance coverage decision is made.

The Court does not find Indemnity's position with regard to the Franco-signature issue credible for the following reasons. First, as explained, notwithstanding its knowledge of how the applications were filled out since April 30, Indemnity thereafter repeatedly took the position that Ocean's 11 was bound by the representations contained in the applications, not that such conduct cloaked Ocean's 11 with unclean hands such that Indemnity could use it as an additional reason to rescind. Second, after having evaluated the myriad reasons advanced by Indemnity as support for its rescission decision, and rejecting each as insufficient, this last reason appears to have been advanced in a last, desperate attempt to justify an ill-conceived and poorly supported decision, rather than to be a legitimate reason an insurer would rely on to refuse to honor its obligations under three contracts of insurance.

### III.  CONCLUSIONS OF LAW

The Court has jurisdiction pursuant to 28 U.S.C. section 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Furthermore, because the insurance policies were issued to a Florida resident, and the events giving rise to this action occurred in Florida, Florida law applies.

The issues for the Court's consideration are: (1) whether Indemnity had the unilateral right to rescind the three policies of insurance on the basis of its insured's material misrepresentations, and (2) whether Indemnity's defense of unclean hands precludes recovery by Ocean's 11. The Court addresses these two in turn.

### A.      Was Indemnity Allowed to Rescind the Policies?

Florida Statute section 627.409[4] provides that misrepresentations, omissions, incorrect statements, and concealment of facts in an insurance application shall not prevent a recovery under a policy of insurance unless they are: "(1) fraudulent; (2) material to the risk assumed by the insurer; or (3) the insurer in good faith would not have issued the policy or would have done so on different terms if the insurer had known the true facts." *United Auto. Ins. Co. v. Salgado*, 22 So.3d 594, 599 (Fla. 3d DCA 2009). Consequently, in Florida an insurer may rescind an insurance policy on the grounds of misrepresentation if it can satisfy any of the foregoing three statutory elements. *See S.R.R.B. ex rel. Vreeland v. Life Investors Ins. Co. of Am.*, No. 8:08-CIV-960-T-17-MAP, 2010 WL 963789, at *2 (M.D. Fla. Mar. 15, 2010). Nevertheless, "[a]n insurer may not deny coverage under this statute . . . if the alleged misrepresentation was in response to an ambiguous question." *Mercury Ins. Co. of Fla. v. Markham*, 36 So. 3d 730, 733 (Fla. 1st DCA 2010) (explaining an ambiguous question is one susceptible to two reasonable interpretations so that a negative and a positive response by an "objectively reasonable person" in the applicant's position would be correct) (citations omitted). Furthermore, to the extent any

---

[4] Florida Statute section 627.409 provides:

Representations in applications; warranties

(1) Any statement or description made by or on behalf of an insured or annuitant in an application for an insurance policy or annuity contract, or in negotiations for a policy or contract, is a representation and is not a warranty. A misrepresentation, omission, concealment of fact, or incorrect statement may prevent recovery under the contract or policy only if any of the following apply:

(a) The misrepresentation, omission, concealment, or statement is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by the insurer.

(b) If the true facts had been known to the insurer pursuant to the policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.

questions in an application for insurance are ambiguous, "[a]mbiguities in an application for insurance are construed liberally in favor of the insured and strictly against the insurer who prepared the policy." *Graham v. Lloyd's Underwriters at London*, 964 So. 2d 269, 274 (Fla. 2d DCA 2007) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993)).

"As a general rule, a misstatement in, or omission from, an application for insurance need not be intentional before recovery may be denied pursuant to section 627.409." *Kieser v. Old Line Life Ins. Co. of Am.*, 712 So. 2d 1261, 1263 (Fla. 1st DCA 1998). "Rather, it need only be material." *Id.* (citing *Cont'l Assurance Co. v. Carroll*, 485 So. 2d 406 (Fla. 1986); *Life Ins. Co. of Va. v. Shifflet*, 201 So. 2d 715 (Fla. 1967)). In examining the claimed misrepresentations, here, however, the Court is mindful that by contract Indemnity consented to a lower standard than the one contained in section 627.409. The warranty language contained in the applications for insurance states that the applicant "represents and warrants to the best of his/her knowledge and belief based on reasonable inquiry" that the statements contained in the application are true and entirely complete. The "knowledge and belief" modifier used by Indemnity in its applications "imposed a different requirement of accuracy than that provided in section 627.409." *William Penn Life Ins. Co. of N.Y. v. Sands*, 912 F.2d 1359, 1364 (11th Cir. 1990) (footnote call number omitted); *see also Green v. Life & Health of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) (by inserting a "knowledge and belief" standard in its application, bypassing the statutory standard, insurer established a lesser knowledge standard than that required by section 627.409). Consequently, "[t]o permit an insurer to rescind a policy containing 'knowledge and belief' language due to an unknowing misstatement not only contravenes the terms of the contract itself, but is unfair as well." *Id.* at 1391 (quoting *Sands*, 912 F.2d at 1364 n.7). For

example, "[i]nsurance applicants faced with a policy that unambiguously stated that it could be voided for unknowing misstatements might have rejected those terms and sought another policy." *Id.* (quoting *Sands*, 912 F.2d at 1364 n.7).

Applying these standards to the claimed misrepresentations,[5] the Court concludes that Indemnity has not sustained its burden under the statute. As to each of the purported misrepresentations, the Court reaches the following legal conclusions, consistent with the factual findings previously explained.

Square Footage: The question posed by Indemnity in its applications concerning square footage asks, "Square Footage," providing no additional explanation. Three months before receiving the application for the first policy period, Indemnity had received a site survey showing the Ocean's 11 facility as having 3,456 total square feet, with 3,000 of those dedicated to public access. During the first policy period, Indemnity's site inspection confirmed the establishment's approximate square footage to be 4,000. In the proposal for insurance for the last policy period of 2011 to 2012, Indemnity showed it understood the square footage to be 4,000, and yet the rate for coverage went down rather than up, reflecting that the difference in square footage did not affect the premium.

In all applications submitted, Ocean's 11 supplied "3,000" in response to this question. According to Morstan's Gregg Kligler, such a question refers to public access rather than an establishment's gross square footage, a reasonable interpretation given that non-public access square footage should not negatively impact liability. Because the question, if it can be called that, is ambiguous, an objectively reasonable person in Franco's position may have interpreted it

---

[5] Curiously, in its post-trial Revised Proposed Findings of Fact and Conclusions of Law [ECF No. 174-1], Indemnity only identifies two areas as material misrepresentations by Ocean's 11, notwithstanding its earlier, lengthy list of purported misrepresentations justifying rescission: the alcohol awareness program and number and hiring of security personnel. (*See id.* 30–37).

as Kligler did and answering to the best of one's knowledge and belief, furnished an answer correct as to the square footage of the establishment's public access.   The Court finds no misrepresentation in the answer.

Anticipated Annual Gross Receipts: The Indemnity applications for insurance ask the applicant to list the anticipated gross receipts, necessarily a projection for the following year. Franco testified that it was difficult to project his business's future gross receipts, as there was a recession and he did not have a computerized banking system or tax returns for the preceding years to estimate the number.   In the first two applications, Ocean's 11 answered this question with the figure $500,000, and Indemnity collected additional premiums once it had Ocean's 11's actual gross receipts, as it was entitled to do under the policies.   Knowing the $500,000 to under-represent Ocean's 11's actual gross receipts, Indemnity nevertheless issued the second policy of insurance; hence, any inaccuracy in the answer was not material to Indemnity's decision to insure Ocean's 11 the second policy period.   Furthermore, in the last application, Ocean's 11 changed its answer to this question given the preceding years' performance, writing $1,000,000, and notwithstanding this change, the rate Indemnity charged Ocean's 11 went down from the preceding policy period.   On these facts, the Court does not find the answers provided to the question asking for a projection to constitute material misrepresentations.

Formal Alcohol Awareness Program: The pertinent question in the applications concerning this subject is woefully unclear.   It asks, "Does the applicant allow persons other than employees trained in their Formal Alcohol Awareness training program to serve alcohol to patrons? (i.e., Guest Bartenders, etc.) ☐   Yes ☐ No  - If yes, please explain[.]"   First, the

question is addressed to the applicant in the singular, but requests information about a plural subject by its use of the possessive pronoun "their."   Second, the phrase "Formal Alcohol

Awareness" is capitalized, but nowhere defined.  Next, the question directs the applicant to the example of guest bartenders, in an apparent attempt to discover whether the applicant allows guest bartenders to serve alcohol, and presumably to clarify the altogether unclear question. Ocean's 11 answered by checking off the "No" box, and Franco testified Ocean's 11 employs an informal training program whereby junior bartenders are trained by senior bartenders when the former start employment.  Franco understood the question to be asking whether Ocean's 11 allowed guest bartenders to serve alcohol, and he answered truthfully that it did not.

Indemnity avers this answer was misleading or incorrect as what Indemnity was seeking to discover by the question was whether the applicant had a formal alcohol awareness training program such as "TIPS," "TAM," or "ServSafe."  The Court still does not know what these acronyms stand for, as Indemnity has never defined them, let alone listed them in the insurance applications for the applicant to know this is the type of training program it was interested in knowing about.   Construing the question against Indemnity, as the Court must given its lack of clarity and grammatical inconsistency, a reasonable person in Franco's position could have answered as he did, considering it to be asking about the role of guest bartenders.  The Court finds no material misrepresentation here either.

Number of Security Employees: In response to the questions, "What is the maximum number of security on any given night?" and "Average per night?", Ocean's 11 responded, respectively, "2" and "1."  The applications do not define "security," and Franco interpreted the word to include those working as bouncers and security at Ocean's 11, but to exclude doormen, whose work at Ocean's 11 is quite different.  This is not an unreasonable interpretation, particularly in light of the absence of a definition alerting the applicant as to what Indemnity considers to be "security."  Furthermore, because Ocean's 11 employed two security personnel

on weekend nights, in order to answer the second part of the question, "average per night," Ocean's 11 would necessarily have to answer a fraction of one if the answer were to apply to the entire work week.

The Court does not find that Ocean's 11 provided materially false answers by distinguishing bouncers and security from doormen, and by averaging the two security personnel employed on weekend nights over the course of an entire week. Furthermore, Indemnity has not shown any inaccuracy in the answers was material to the risk assumed nor that it would not have issued the policies had it known the answers did not include doormen because the Indemnity underwriting guidelines themselves show the insurance rate for an establishment having between one and four security personnel is the same and the rate only increases when the number of security personnel is between five to ten.

Background Checks: Indemnity has failed to sustain its burden of showing Ocean's 11's answer to this question was false. Franco gave unrebutted testimony that he uses the services of a criminal defense attorney to run background checks before Ocean's 11 hires new employees.

Experience of the Owner: At the time Franco opened Ocean's 11 in 2006, he had about 18 years of experience as a manager and owner of bars and restaurants. In both the January 2010 and January 2011 Proposals for Insurance, in response to the question, "Number of years of management experience the General Manager/Owner has at this location or another location that is a similar establishment," Ocean's 11 answered "5". The question is relevant to Indemnity's assessment of risk and assignment of premium as the more experience a general manager possesses, the less an insured's premium. Thus, that Franco answered "5" in both 2010 and 2011 is not problematic. Because the question is phrased in the disjunctive, Franco could have truthfully answered "over 20" to the question in each of the proposals, reflecting his total years

of managerial and ownership experience of bars and restaurants.  Franco's misstatement, if any, was to his detriment.  Therefore, Franco's representation of his experience managing and owning bars and restaurants could not have operated as a material misrepresentation.

Maximum Occupancy: Ocean's 11 represented in the applications for insurance that its maximum occupancy was 350.   Indemnity presented no evidence to controvert this. Consequently, Indemnity failed to carry its burden on its defense that this representation was incorrect.   Moreover, Indemnity charged Ocean's 11 an annual fee of $950 to inspect the premises, and this issue was not addressed in any post-inspection communications with its insured by Indemnity.

Off-Duty Police Officers: The insurance applications ask the applicant to advise if it "engage[s] police officers for work in or about the premises."  Ocean's 11 always answered this question "no."  From March 30, 2010 to August 2010, Ocean's 11 employed off-duty police officers to assist it with acts of vandalism that were occurring in the parking lot.  At the time the first and second applications for insurance were submitted, Franco did not contemplate hiring off-duty police officers, and so did not furnish any information concerning this engagement that he could not have anticipated.  Even though the third application for insurance was submitted after off-duty police officers had been hired and their services terminated by Ocean's 11 in 2010, at the time the third application was submitted, Franco did not anticipate needing off-duty police again.   Franco did hire off-duty police during the third policy period, after Indemnity had announced its rescission of the policies.

Clearly the answers given by Ocean's 11 to the pertinent question in the first and second applications were not incorrect or untruthful. Franco testified he had not used off-duty police before, did not anticipate hiring them, and only did so in 2010 when a vandalism problem arose.

And when he answered the question consistently in the final application, he did not anticipate needing off-duty police during the third policy period.   A question that asks whether the applicant uses police officers in the present tense cannot expect to yield a response covering past conduct or unanticipated future conduct.

In short, the Court finds Indemnity has not carried its burden of proving any of the claimed misrepresentations in the Ocean's 11 applications for insurance were incorrect or material.  Indemnity has not satisfied its burden under Florida Statute section 627.409.

**B.     Is Ocean's 11 Barred From Recovery on the Basis of Unclean Hands?**

Unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  Under the doctrine of unclean hands, "'[o]ne who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice[,] or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law.'"  *In re Garfinkle*, 672 F.2d 1340, 1347 n.7 (11th Cir. 1982) (quoting *Peninsula Land Co. v. Howard*, 6 So. 2d 384, 389 (Fla. 1941)).  The conduct constituting the unclean hands "must generally be connected with the matter in litigation and must affect the adverse party."  *McCollem v. Chidnese*, 832 So. 2d 194, 196 (Fla. 4th DCA 2002) (citing *Pennington v. Pennington*, 390 So. 2d 809, 810 (Fla. 5th DCA 1980)).  To be sure, "that a party's conduct is disreputable is entirely irrelevant where the party asserting unclean hands is not the target of, and has taken no action in reliance on that conduct, however disdainful of that conduct a court may be."  *Id.* (citing *McIntosh v. Hough*, 601 So. 2d 1170, 1172–73 (Fla. 1992)).  Accordingly, "[a] party must prove that he was injured in order for

the unclean hands doctrine to apply." *Id.* (citing *Sandusky v. First Nat'l Bank of Sikeston*, 773 S.W.2d 95 (Ark. 1989)).

"Unclean hands . . . is an equitable defense that must be pled with the specific elements required to establish the defense." *MPC Containment Sys., Ltd. v. Moreland*, No. 05 C 6973, 2008 WL 1775501, at *5 (N.D. Ill. Apr. 17, 2008) (footnote call number omitted); *see Home Mgmt. Solutions, Inc. v. Prescient, Inc.*, No. 07-20608-CIV, 2007 WL 2412834, at *4 (S.D. Fla. Aug. 21, 2007) (striking affirmative defense of unclean hands based on the failure to plead any supporting facts or the elements of the defense). As with other affirmative defenses, the party invoking the doctrine of unclean hands has the burden of proof. *See Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999). Furthermore, application of the unclean hands doctrine "rests with the discretion of the court, which is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 969–70 (S.D.N.Y. 1992) (quoting *Keystone Driller Co. v Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

First, the Court observes that Indemnity's defense of unclean hands was insufficiently pleaded in its Answer. No supporting facts are alleged; rather, the defense relies on a conclusory statement or label. A majority of lower courts have found that affirmative defenses must satisfy the heightened pleading standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Castillo v. Roche Labs. Inc.*, No. 10-20876-CIV, 2010 WL 3027726, at *2 (S.D. Fla. Aug. 2, 2010) (collecting cases). Nevertheless, Ocean's 11 did not timely move to strike this defense under Federal Rule of Civil Procedure 12(f). And while the defense was not noted in the parties' Pre-Trial Stipulation, nor was the legal question included in the Pre-Trial Stipulation as one the Court would be asked to resolve, the affirmative

defense is found in the Answer.  And as explained for the first time after the trial, the issue relies upon facts known by Ocean's 11 and addressed in the factual summary contained in the Pre-Trial Stipulation, namely, Franco's manner of authorizing his insurance agent to sign Franco's name to all of the insurance applications.

Addressing the question directly, then, the Court must determine if Indemnity has shown unclean hands by the action of Franco in having his agent sign Franco's name to the applications. As previously stated, Indemnity at all times before trial insisted that the agent's act of signing the contracts for Franco did not relieve Ocean's 11 of its obligations; that Ocean's 11 was bound as if Franco had signed the applications.  And this is indeed the case, given that under Florida law, "an undisclosed principal — Plaintiff['s] . . . designation if . . . [the agent] indeed signed the . . . Contract on his behalf, as he asserts he did — can sue on a contract without disclosure of the agency relationship."  *Matienzo v. Mirage Yacht, LLC*, No. 10-22024-CIV, 2011 WL 1375684, at *4 (S.D. Fla. Apr. 12, 2011) (citation omitted).  Furthermore, it appears unremarkable that the agent would have signed Franco's name to the Indemnity insurance applications, and the parties' pre-trial positions concerning this factual issue were consistent with Florida case law recognizing the insured would be bound by his agent affixing his signature to the applications.  *See Empire Fire & Marine Ins. Co. v. Koven*, 402 So. 2d 1352 (Fla. 4th DCA 1981) (when insured's broker signed insured's name on rejection of uninsured motorist coverage, and insured denied giving broker authorization to reject such coverage, even if the broker improperly placed insured's signature on the application, insured bore the risk of such error); *Gazie v. Ill. Emp'rs Ins. of Wausau, Inc.*, 583 So. 2d 1098 (Fla. 4th DCA 1991) (actions of agent of insureds who allegedly forged insureds' signatures on form rejecting uninsured motorist coverage was binding on insureds).  Similarly, although the signature lines on the Indemnity applications require that the

person signing the applications be the "Owner, Officer or Partner" of the applicant, "nothing in the application . . . form suggests that it may not be signed by an authorized agent of the named insured." *Mercury Ins. Co. of Fla. v. Sherwin*, 982 So. 2d 1266, 1270 (Fla. 4th DCA 2008).

It was only post-trial that Indemnity first took the position this set of facts might fit within the description of an act constituting "unclean hands" by Ocean's 11.   Indemnity relies upon *Roth v. American Family Mutual Insurance Co.* for the proposition that "it is misconduct to sign another person's name to an insurance application without indication that it is not the applicant's signature.  It is deceptive, since it is not the kind of deviation from instructions that a supervisor would catch, and it could get the company into trouble."  567 F.3d 884, 887 (7th Cir. 2009).  *Roth*, however, is factually inapposite, and its broad statements concerning misconduct and deception should be read in light of the facts of the case, which concerned whether the insurance company had breached agency agreements by terminating insurance agents without notice.  In *Roth*, the plaintiffs were insurance agents of American Family Insurance, and the insurance company terminated their agency agreement after it was discovered that one plaintiff signed the name of the applicant on an insurance application and the other plaintiff signed the name of another agent on a different policy, certifying the other agent had given the insured information and seen him read and sign the contract. *See id.* at 885–86.  The issue for consideration was whether plaintiffs' signing other persons' names on insurance applications was "dishonest" conduct "*within the meaning of the agency agreement* even though there is no suggestion that either plaintiff derived a financial benefit," thereby entitling the insurance company to terminate plaintiffs without notice under the agency agreement.  *Id.* at 886 (emphasis added).

The broad assertions of what constituted dishonest conduct or misconduct in *Roth* concerned conduct clearly proscribed by the company's manual, and forming the basis for a termination without notice of an agency agreement.  Here, in contrast, the purported wrongdoing committed by Franco was authorizing his insurance agent to sign the Franco name to the insurance applications, an unremarkable event given the abundant case law in Florida, recognized by Indemnity in all of its pre-trial filings, that an insured is bound even when it is the agent who signs the contract of insurance.  Indemnity's last-minute attempt to label this conduct by Franco "unclean hands" is unavailing.   As explained, Cohen's credibility on this point is undermined because the defense is raised after Indemnity has failed to prove all other purported "misrepresentations" by Ocean's 11.   It is also incredible because it is asserted post-trial, in an attempt to fit into an unarticulated and legally insufficient legal defense of "unclean hands" never raised before or during trial.  *See, e.g., Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 272 (9th Cir. 1996) ("Bradley undermines her credibility by simultaneously telling two different stories about her work performance.").[6]  And it is of no moment that the numerous pre-trial statements concerning the effect of Franco's agent's actions were made by Indemnity's lawyer, rather than Cohen directly.  *See Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (doctrine of judicial estoppel, which prevents a party from asserting a position in a legal proceeding that is contrary to a position taken previously in the same or earlier proceeding, may be invoked through statements made by an attorney and imputed to the party).

---

[6]  Indeed, it could be said that Indemnity is equitably stopped from trying to fit this factual issue into the undefined label of "unclean hands" given its prior and repeated insistence that Ocean's 11 was bound by the answers given in the applications notwithstanding the agent's actions.  *See Sea Byte, Inc. v. Hudson Marine Mgmt. Servs., Inc.*, 565 F.3d 1293, 1304 (11th Cir. 2009) ("For equitable estoppel to apply there must be a representation of fact by one party contrary to a later asserted position, good faith reliance by another party, and a detrimental change in position by the later party due to the reliance." (citation omitted)).  The Court does not decide the question, however, on the basis of this legal principle.

Ocean's 11 is entitled to a judgment declaring Indemnity to have improperly rescinded the contracts of insurance. Consequently, Indemnity is required to provide defenses to all claims arising during the periods covered by the insurance policies, that is, from February 2009 to February 2012, subject to the coverage provisions of the policies. Ocean's 11 shall return to Indemnity the premiums returned to it when Indemnity declared a rescission. Furthermore, Indemnity is entitled to a judgment on its breach of contract claim, as Indemnity breached the policies of insurance by denying Ocean's 11 a defense to the state suits, and Ocean's 11 has suffered damages in the amount of $5,000, plus interest.

The Court resolves the issues in favor of Ocean's 11 and against Indemnity. For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that final judgment will be entered by separate order in favor of Ocean's 11 Bar & Grill, Inc. and against Indemnity Insurance Corporation, RRG. Plaintiff is instructed to submit a proposed order[7] of final judgment by November 9, 2012. The form of judgment may reserve the Court's jurisdiction over any attorney's fees and costs issues that remain unresolved.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2nd day of November, 2012.

*Cecilia M. Altonaga*
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[7] Pursuant to the CM/ECF Administrative Procedures, proposed orders shall be filed as an attachment to a motion, notice, or other filing. The proposed document must also be e-mailed to altonaga@flsd.uscourts.gov. The proposed document shall be submitted by e-mail in Word format. The e-mail line and the name of the attachment should include the case number, followed by a short description of the attachment (e.g., 00-cv-00000 Order).